UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| WALSH CONSTRUCTION COMPANY II, LLC, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) No. 4:23-CV-01297-CMS ) |
| ACE AMERICAN INSURANCE COMPANY, | ) ) ) ) |
| Defendant. | ) |

**OPINION, MEMORANDUM, AND ORDER**

This matter is before the Court on Defendant ACE American Insurance Company's Motion for Summary Judgment. (Doc. 51). The Court **GRANTS** ACE's Motion for Summary Judgment on all counts.

**FACTUAL AND PROCEDURAL HISTORY**

**Plaintiff's Complaint**

Walsh Construction Company was hired as the general contractor for the Merchants Bridge project in Granite City, Illinois. (Doc. 1 at 1). In August 2018, Terminal Railroad Association of St. Louis, purchased an "'all risk' completed value builders risk insurance policy'" from ACE American Insurance Company. (Doc. 1 at 1; 5). The Policy identified Walsh as an additional named insured. (Doc. 1 at 1).

On September 30, 2019, flooding of the Mississippi River damaged some of the work that Walsh had completed on the Bridge. (Doc. 1 at 7). Work on the Bridge was suspended for a total of 43 days: from September 30, 2019, to November 11, 2019. (Doc. 1 at 8). According to Walsh, the work stoppage resulted in "extra costs and expenses," including "labor and equipment

1

costs." Walsh alleged that these "expediting expenses and extra costs . . . caused physical loss covered by the Policy" in excess of $2.8 million. (Doc. 1 at 8).

The Mississippi River flooded again on March 13, 2020. (Doc. 1 at 2). The March 2020 flood physically damaged the Bridge construction site and required work to be suspended from March 13, 2020, to July 12, 2020. (Doc. 1 at 9). As with the September 2019 flood, Walsh alleged that it incurred "extra costs and expenses" covered by the Policy. (Doc. 1 at 10). Walsh claims that these extra costs exceeded $900,000, but that ACE informed Walsh that only $752,167.39 was recoverable under the Policy. (Doc. 1 at 10). Additionally, Walsh claimed that it had incurred "claim preparation expenses" of $16,773.75, but that ACE had declined to pay more than $2,362.50. (Doc. 1 at 11).

On June 17, 2020, ACE denied Walsh's claim for "extra and expediting expenses" arising out of the September 30, 2019, flood. (Doc. 1 at 11). ACE agreed that Walsh's work on the Bridge had been delayed because of the September flood, but asserted that these expenses were covered under the "period for delay coverage" added to the Policy. (Doc. 1 at 11). Four days later, ACE supplemented its denial and asserted that Walsh's coverage was "sublimited to $10,000,000 or 20% of the physical loss, whichever is less." (Doc. 1 at 12). According to Walsh, the actual sublimit applicable to the Expediting and Extra Expense Clause was not limited to a percentage of the physical loss. (Doc. 1 at 12).

On September 20, 2022, ACE denied Walsh's claim for expediting and extra expenses arising out of the September 2019 flood again. (Doc. 1 at 12). ACE told Walsh that there was no coverage for "idle equipment" expenses during the period of restoration. (Doc. 1 at 13).

ACE also applied the same reasoning to the costs associated with the March 2020 flood. (Doc. 1 at 15). On June 7, 2023, ACE admitted that the March 2020 flood had caused physical

2

damage to the Bridge. (Doc. 1 at 15). But ACE again asserted that idle equipment and labor costs were not covered by the Policy; according to ACE, "Walsh would have incurred the same equipment expenses" with or without the March 2020 flood. (Doc. 1 at 15).

Walsh filed a Complaint against ACE asserting three claims: (1) Breach of Contract for the September 2019 flood; (2) Vexatious Refusal to Pay relating to the September 2019 flood; and (3) Breach of Contract for the March 2020 flood. (Doc. 1). ACE timely filed its Answer on December 29, 2023. (Doc. 18). ACE now moves for summary judgment after the completion of discovery. (Doc. 51).

### ACE's Motion for Summary Judgment

ACE moves for summary judgment on all three counts. ACE argues that summary judgment is proper because the Policy is "unambiguous and there is no coverage under the policy for any of Walsh's claims[.]" (Doc. 51, p. 2). In regards to Counts 1 and 3—Walsh's breach of contract claims—ACE argues that Walsh is not entitled to coverage under the Policy's Expediting and Extra Expenses provision because any costs Walsh alleges to have incurred during the work stoppages are not "over and above the total costs that would normally have been incurred during the same period of time had no direct physical LOSS occurred." (Doc. 51 at 2). On Count 2, ACE asserts that it has not acted in a "vexatious and unreasonable manner" in addressing Walsh's September 30, 2019 flood claim for the same reason: "[t]here is no coverage for Walsh's claim for Expediting and Extra Expenses." (Doc. 51, p. 2).

Along with its Motion for Summary Judgment, ACE filed a Memorandum of Law and Statement of Material Facts. (Doc. 52; Doc. 53). Walsh filed a Response to ACE's Statement of Material Facts (Doc. 59) and its own Statement of Material Facts. (Doc. 60). ACE filed a Response to Walsh's Statement of Material Facts. (Doc. 65).

**The Uncontroverted Material Facts[1]**

Walsh was engaged to renovate, repair, and expand the Merchants Bridge between St. Louis, Missouri, and Illinois. (Doc. 65, p. 1). ACE issued Construction Risk Coverage Policy I11144834 to Terminal Railroad Association of St. Louis with a policy term of August 1, 2018, to October 31, 2022, which listed Walsh as an additional named insured. (Doc. 59, p. 1). The Policy provides Construction Risk coverage for the project with a flood deductible of $250,000. (Doc. 65, p. 1-2). In connection with the project, Walsh rented a variety of specialized equipment. (Doc. 65, p. 1). Walsh managed the project through supervisory staff it relocated to St. Louis. (Doc. 65, p. 4).

The September 30, 2019, flood caused physical damage to the Bridge and resulted in the suspension of work from September 30, 2019, to November 11, 2019. (Doc. 59, p. 6). ACE determined that the amount of physical damage to the project was $128,629.40, but did not pay Walsh anything because this was less than the $250,000 deductible. (Doc. 59 p. 6). In addition, Walsh submitted an expediting and extra expenses claim in the amount of $1,260,745.07. (Doc. 59, p. 6). ACE denied this claim, asserting that Walsh was attempting to file a premature delay claim. (Doc. 65, p. 4). On September 21, 2020, ACE sent Walsh a letter including the Expediting and Extra Expense provision of the Policy. (Doc. 65, p. 4).

The second flood, on March 13, 2020, also physically damaged the Bridge. (Doc 59. p. 8). Work was again stopped on the project from March 13, 2020, to July 12, 2020. (Doc. 59, p. 8). ACE determined that the amount of physical damage to the project was $752,167.60, and

---

[1] This section sets out only the uncontroverted facts that may "affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As discussed in the Analysis section below, some facts are uncontroverted when viewed in the context of the Policy. Because these facts rely on the interpretation of the Policy, additional facts that are relevant to the Court's decision to grant summary judgment for ACE on all counts are set out in the Analysis section.

paid Walsh that amount, less the deductible. (Doc. 59, p. 9). Walsh also claimed that ACE owed it $3,029,627 for expediting and extra expenses. (Doc. 59, p. 9). Walsh sought $14,411.75 for claim preparation costs, and ACE ultimately paid claim preparation costs to Walsh in the amount of $17,212.08. (Doc. 59, p. 9). On June 7, 2023, ACE denied Walsh's claim for extra expenses on the ground that the idle equipment and labor expenses would have been incurred regardless of the flood. (Doc. 65, p. 6).

## ANALYSIS

### Summary Judgment Standard

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). A party moving for summary judgment bears the burden of demonstrating that no genuine issue exists as to any material fact. *Id.* at 323. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party can satisfy its burden in either of two ways: it can produce evidence negating an essential element of the nonmoving party's case, or it can show that the nonmoving party does not have enough evidence of an essential element of its claim to carry its ultimate burden of persuasion at trial." *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018) (citing *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000)).

When the moving party meets this burden, "the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Liberty Lobby, Inc.*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). The "party opposing a properly supported motion for summary

5

judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256 (quoting Fed. R. Civ. P. 56(e)). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

## ACE is Entitled to Summary Judgment on All Counts.

Both parties agree that Missouri law governs this dispute. In Missouri, "[a] breach of contract action includes the following essential elements: (1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 104 (Mo. 2010) (en banc) (citing *Howe v. ALD Servs., Inc.*, 941 S.W.2d 645, 650 (Mo. App. 1997)).

The interpretation of an insurance policy is a question of law reviewed *de novo*. *Owners Ins. Co. v. Craig,* 514 S.W.3d 614, 616 (Mo. 2017) (en banc) (quoting *Seeck v. Geico Gen. Ins. Co.*, 212 S.W.3d 129, 132 (Mo. 2007) (en banc)). "When interpreting an insurance policy, [a court] gives the policy language its plain meaning, or the meaning that would be attached by an ordinary purchaser of insurance." *Seaton v. Shelter Mut. Ins. Co.*, 574 S.W.3d 245, 247 (Mo. 2019) (en banc) (quoting *Doe Run Res. Corp. v. Am. Guar. & Liab. Ins.*, 531 S.W.3d 508, 511 (Mo. 2017) (en banc). "Definitions, exclusions, conditions and endorsements are necessary provisions in insurance policies." *Piatt v. Ind. Lumbermen's Mut. Ins. Co.*, 461 S.W.3d 788, 792 (Mo. 2015) (en banc) (quoting *Todd v. Mo. United Sch. Ins. Council*, 223 S.W.3d 156, 163 (Mo. banc 2007) (en banc)). When a word or phrase is undefined, the ordinary meaning of a term or

6

phrase is determined from the dictionary.[2] *Martin v. U.S. Fidelity and Guar. Co.*, 996 S.W.3d 506, 508 (Mo. 1999) (en banc) (quoting *Farmland Industries, Inc. v. Republic Ins. Co.*, 941 S.W.2d 505, 508 (Mo. 1997) (en banc)).

"When policy language is clear and unambiguous, the policy must be enforced as written," and the canons of construction are unnecessary. *Taylor v. Bar Plan Mut. Ins. Co.*, 457 S.W.3d 340, 344 (Mo. 2015) (en banc) (citing *Allen v. Cont'l W. Ins. Co.*, 436 S.W.3d 548, 554 (Mo. 2014) (en banc)). "An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy." *Seaton*, 574 S.W.3d at 247 (quoting *Taylor*, 457 S.W.3d at 344). "Ambiguities in the meaning of an insurance policy are resolved in favor of the insured, and exclusionary clauses are strictly construed against the drafter." *Mendenhall v. Prop. And Cas. Ins. Co. of Hartford*, 375 S.W.3d 90, 92 (Mo. 2012) (en banc) (citing *Burns v. Smith*, 303 S.W.3d 505, 509 (Mo. 2010) (en banc)).

1. **ACE Did Not Breach the Insurance Contract Because the Policy Does Not Cover Walsh's Claimed Extra Expenses (Counts I and III)**

    a. *The Policy only covers Extra Expenses incurred during the period of restoration and repair.*

The Expediting and Extra Expenses provision of the policy resolves this dispute. That provision provides, in whole:

> In the event of direct physical LOSS insured hereunder, and occurring during the Policy period, the Company will pay for the reasonable and necessary extra costs to make temporary repairs, and to expedite the permanent repair or replacement of the insured property which is damaged by an insured peril; including additional wages for overtime, night work, and work on public holidays and the extra costs of express freight or other rapid means of transportation. In addition, the Company will pay for the reasonable and necessary Extra Expense incurred during the period of restoration and repair that are over and above the total costs that would normally have been incurred during the same period of time had no

---

[2] Webster's Third International Dictionary is the "institutional dictionary" of the Supreme Court of Missouri. *AAA Laundry & Linen Supp. Co. v. Dir. of Revenue*, 425 S.W.3d 126, 132 (Mo. 2014) (en banc).

7

> direct physical LOSS occurred. Extra Expense shall include equipment rental, emergency expenses, temporary use of property, demobilization and remobilization of equipment and facilities and other expenses necessarily incurred to reduce LOSS; excluding however, any coverage provided by the Delay in Opening Endorsement if endorsed to this Policy.

(Doc. 1-1, p. 13).

Thus, "Extra Expenses" are covered if the expenditures are: (1) reasonable and necessary; (2) incurred during the period of restoration and repair; and (3) over and above the total costs that would normally have been incurred during the same period of time had no direct physical loss occurred. *See KT State & Lemon LLLP v. Westchester Fire Ins. Co.*, 2023 WL 2456499 at *5 (M.D. Fla. Mar. 10, 2023) (interpreting an identical provision and reaching the same conclusion).

First, this provision of the Policy contains a temporal limit. Under the plain language of the Policy, ACE is required to pay Walsh for only the Extra Expenses "incurred during the period of restoration and repair." (Doc. 1-1, p. 13). "Period of restoration and repair" is not defined in the Policy.[3] When read in conjunction with the preceding sentence, the "period of restoration and repair" refers to the period of time in which the Bridge is repaired and restored to the previous condition before the loss occurred – not the entire project.

The first sentence of this provision provides, "In the event of direct physical LOSS insured hereunder, and occurring during the Policy period, the Company will pay for the

---

[3] Both Walsh and ACE agree that Trippel, an Executive Claims Director for ACE, understood "period of restoration and repair" to be "the period of time when the covered physical loss first occurred up until the time of due diligence and dispatch when the physical loss is repaired or replaced." (Doc. 59, p. 5; Doc. 65, p. 8). While the Court ultimately agrees with Trippel's interpretation of the Policy, the interpretation of a contract is a question of law, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO, Council 61 v. State*, 653 S.W.3d 111, 127 (Mo. 2022) (en banc), and Missouri "courts declare the law." *Gershman Inv. Corp. v. Danforth*, 517 S.W.3d 33, 35 (Mo. 1974) (en banc).

reasonable and necessary extra costs to make temporary repairs, and to expedite the permanent repair or replacement of the insured property which is damaged by an insured peril[.]" By its own terms, this sentence applies only in the event of a loss that requires "temporary repairs" and when there is a need to "expedite the permanent repair or replacement of the insured property which is damaged by an insured peril." (Doc. 1-1, p. 13).

Naturally, then, the phrase "period of restoration and repair" refers to the time when the preceding sentence is triggered. Each clause of a contract "must be read in the context of the entire contract[.]" *State ex rel. Pinkerton v. Fahnestock*, 531 S.W.3d 36, 44 (Mo. 2017) (*en banc*) (quoting *McGuire v. Lindsay*, 496 S.W.3d 599, 607 (Mo. App. 2016)), abrogated on other grounds by *Theroff v. Dollar Tree Stores, Inc.*, 591 S.W.3d 432 (Mo. 2020) (*en banc*).  The phrase "period of restoration and repair" borrows the term "repair" from the preceding sentence. Through the use of the same term "repair" and the similar term "restoration," the provision unambiguously applies only when damage is being "repair[ed]."

The conditional phrases in the first two sentences point in the same direction. The first sentence starts, "In the event of direct physical LOSS insured hereunder…" (Doc. 1-1, p. 13). Similarly, the second sentence ends with the condition that "Extra Expense" coverage is evaluated based on whether the total costs are "over and above what normally would have been incurred during the same period of time had no direct physical LOSS occurred." (Doc. 1-1, p. 13). Because both the first and second sentence are based on the same condition—whether a direct physical loss has occurred—the phrase "period of restoration and repair" refers to the time necessary to repair and replace the Bridge to its previous condition before the loss occurred.

The dictionary definitions of "restoration and repair" confirm this result. "When a term consists of more than one word ... and an applicable definition for the term itself cannot be found

9

in the dictionary, it still can be somewhat helpful to look to the dictionary's definitions of the term's constituent parts as an aid to understanding." *JAM Inc. v. Nautilus Ins. Co.*, 128 S.W.3d 879, 894 (Mo. App. 2004) (quoting *Mansion Hills Condo Ass'n v. Am. Family Mut. Ins. Co.*, 62 S.W.3d 633, 638 (Mo. App. 2001) (emphasis removed)). The relevant definition of "repair" is "to restore by replacing a part or putting together what is torn or broken: FIX, MEND. …" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1923 (2002). Similarly, "Restoration" is defined as, "an act of restoring or the condition or fact or being restored: as a: the bringing back to or putting back into a former position or condition. … the process or putting a building back into nearly or quite the original form. …" *Id.* at 1936.

In moving for summary judgment, ACE alleges that Walsh paid no "extra costs" during the time periods during which work was stopped due to the September 2019 and March 2020 floods. (Doc. 53, p. 6-8). ACE's expert, Melissa Impastato, reviewed Walsh's invoices and concluded that Walsh did not incur any additional costs during the period of restoration and repair. (Doc. 53-10, p. 148-49; p. 175).

Walsh's cited evidence does not contradict this finding. Walsh's Senior Project Manager, Daniel Sieve, testified that Walsh ultimately paid more for equipment and labor "[a]t the end of the project." (Doc. 59-2, p. 7:21:22). Sieve tied Walsh's higher costs to the need to work longer to make up for the work stoppages due to the floods: "[W]e were paying more. We were paying for equipment that we weren't using. We had manpower there that was not doing the full function that they would be doing had we been doing the work. So now we had to have the equipment for a longer period of time, say eight months, and we had to have the personnel there for a longer period of time, about eight months. So that is the additional expense." (Doc. 59-2, p.

10

7:22:18-7:23-1). Sieve later clarified in his deposition, "[W]e had to pay those as extra expenses to do the work because we had to have the people there and the equipment there longer than anticipated." (Doc. 59-2, p. 11:41-19-23).

As already explained at length, the plain language of the policy requires additional expenses to be incurred during the "period of restoration and repair" to qualify as covered "Extra Expenses." But Walsh never identifies when it incurred the additional cost resulting from the delayed project.  In context, Sieve's testimony—the only source that Walsh relies on to controvert ACE's Statement of Material Facts on this point—cannot be read to imply that Walsh incurred the additional expenses during the periods of restoration and repair. Sieve testified that the job cost twice the initial estimate "because of all the work that would have been done during [the periods of restoration and repair] now had to be performed after [those periods] with the same equipment being on-site for that long a period of time." (Doc. 59-1, p. 45:172:17-22). According to Sieve, Walsh incurred costs while workers and equipment were "sitting on-site and then again" when Walsh "actually performed the work." (Doc. 59-1, p. 46:174:3-7). In short, Sieve admitted that Walsh actually incurred its alleged "over and above" costs *after* the period of restoration and repair. Given that the plain language of the policy covers Extra Expenses incurred only "during the period of restoration and repair," the Policy does not cover Walsh's claims for Extra Expenses.

> **b. Walsh did not incur any Extra Expenses during the periods of restoration and repair that were over and above the total costs that would normally have been incurred during the same period of time had the floods not occurred.**

Additionally, the Policy covers only expenditures "over and above the total costs that would normally have been incurred during the [period of restoration and repair] had no direct physical LOSS occurred." (Doc. 1-1, p. 13). As part of its Statement of Material Facts, ACE

11

claims that all of the idle labor and equipment costs would have been incurred without the 2019 flood event. (Doc. 53, p. 6). Because Walsh therefore incurred "no extra costs… during the time period that work was stopped due to the September 30, 2019," (Doc. 53 at 5), ACE alleges there is no coverage under the Policy for the idle labor and equipment costs.

Again, Walsh opposes this portion of ACE's Statement of Material Facts, (Doc. 59, p 7), but none of Walsh's assertions in support of its claim controverts ACE's factual allegations when viewed in the context of the Policy. All of Walsh's denials rely on deposition testimony of the Senior Project Manager, Mr. Sieve, which does not support Walsh's claim. (Doc. 59, p. 7; Doc. 59-2, p. 4, 6:9).

Sieve testified that Walsh did not "anticipate incurring the expense of idle equipment" when submitting a bid for the Bridge. (Doc. 59-2, p. 13, 45:8-12). Sieve stated that Walsh would have normally incurred the cost of working equipment during the flood-caused work stoppages, but instead incurred the cost of idle equipment. (Doc. 59-2, p. 13, 45:13-16). Sieve then conceded that even though the equipment was idle, "it was still paid at the same rental rate." (Doc. 59-2, p. 13, 45:20-21).

This concession is all but dispositive. The Policy does not differentiate between idle and working equipment. (Doc. 1-1, p. 13). Instead, the relevant question under the Policy is whether Walsh incurred costs that are "*over and above the total costs* that would normally have been incurred during the same period of time had no direct physical LOSS occurred." (emphasis added).  Sieve admitted that the idle equipment was billed at the same rate, meaning that the cost Walsh incurred during the "period of restoration and repair" was precisely the same as if no loss had occurred.

12

Walsh's Statement of Material Facts presents a second theory of coverage: that "Walsh incurred the expense of idled rental equipment and idled personnel" because Walsh "project[ed]" that leaving the equipment idle would be more cost-effective than demobilizing and remobilizing the equipment. (Doc. 60). Sieve testified that demobilizing and remobilizing the idle equipment during the flood periods would have been more expensive than the cost of leaving the idle equipment at the worksite. (Doc. 59-2, p. 6, 14:11-15).

Walsh's claim that it saved money by declining to demobilize and remobilize idle equipment flips the applicable Policy language on its head. The Policy provides that ACE "will pay for the reasonable and necessary Extra Expense incurred during the period of restoration and repair that are over and above the total costs that would normally have been *incurred during the same period of time had no direct physical LOSS occurred*." (Doc. 1-1, p. 13) (emphasis added). If there had been no flood event, there would have been no expenses for demobilizing and remobilizing equipment. Moreover, the Policy applies only when Walsh's total costs during the same period are "over and above the total costs." (Doc. 1-1, p. 13). There is nothing in the policy that grants coverage to Walsh for choosing a less-expensive alternative to demobilizing and remobilizing equipment in the event of a loss.

As the Policy does not cover Walsh's claim for Extra Expenses, ACE did not breach the insurance contract in refusing to pay Walsh's Extra Expense claims. Similarly, there is no genuine dispute that Walsh incurred no expenses that were "over and above the total costs that would normally have been incurred during the" periods of restoration and repair had the floods not occurred. For these reasons, ACE did not breach the insurance contract in refusing to cover Walsh's claimed Extra Expenses, and ACE is entitled to summary judgment on Counts I and III.

**2. Because ACE Had No Duty to Pay Walsh's Claimed Extra Expenses, ACE is Entitled to Summary Judgment on Walsh's Vexatious Refusal to Pay Claim (Count II).**

To succeed on a Missouri vexatious refusal to pay claim, an insured plaintiff must prove that: (1) he had an insurance policy with the defendant; (2) the defendant refused to pay: and (3) the refusal was without reasonable cause or excuse. *Dhyne v. State Farm Fir and Cas. Co.*, 188 S.W.3d 454, 457 (Mo. 2006) (en banc). The statute creating this cause of action, RSMo § 375.420, applies only to "losses insured or covered by the policy." *Sloan v. Farm Bureau Town & Country Ins. Co. of Mo.*, 696 S.W.3d 481, 484 (Mo. App. 2024) (citing *Spring Lumber, Inc. v. Union Ins. Co.*, 627 S.W.3d 96, 122 (Mo. App. 2021)). "Where an insurer had no duty to pay under the insurance policy, there cannot be a claim for vexatious refusal to pay." *Progressive Preferred Ins. Co v. Reece*, 498 S.W.3d 498, 506 (Mo. App. 2016).

As the Court already has concluded, the Policy does not cover Walsh's claim for Extra Expenses. ACE is entitled to summary judgment on Count II because ACE had no duty to pay under the Policy.

## CONCLUSION

ACE's Motion for Summary Judgment (Doc. 51) is **GRANTED** on all counts. An appropriate Judgment shall accompany this Opinion, Memorandum, and Order.

Dated this 18th day of December, 2025.

_____
CRISTIAN M. STEVENS
UNITED STATES DISTRICT JUDGE